# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TREY GREENE, individually and on behalf of all others similarly situated,<br><div align="center">Plaintiff,</div><br>    v.<br><br>ZAC PRINCE, FLORI MARQUEZ, TONY LAURA, JENNIFER HILL and GEMINI TRADING, LLC,<br><br><div align="center">Defendants.</div> | Case No. |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Trey Greene ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendants Zac Prince ("Prince"), Flori Marquez ("Marquez"), Tony Laura ("Laura"), Jennifer Hill ("Hill") ("BFI Defendants") and Gemini Trading LLC ("Gemini") (collectively "Defendants"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge. Plaintiff believes that substantial additional evidence will be adduced through discovery in support of these claims.

## I.    NATURE OF THE ACTION

1.    This action arises out of the sale of unregistered securities by the crypto company BlockFi, Inc., a New Jersey based company founded by Prince and Marquez and controlled by the BFI Defendants. The unregistered securities sold by the BFI Defendants on behalf of BlockFi were marketed and sold via a steady stream of misrepresentations and material omissions by Prince and Marquez over several years and through intermittent misrepresentations by Defendant Gemini.

2.      From March 4, 2019 to November 10, 2022 (the "Class Period"), BlockFi, a New Jersey-based financial services company has (directly or indirectly through subsidiaries) offered and sold BlockFi unregistered BlockFi Interest Accounts ("BIAs") to investors, through which investors can earn a return from BlockFi which deploys investors' assets in various ways, including loans of investors' funds crypto made to institutional, corporate and other borrowers, lending U.S. dollars to retail investors, and by investing in equities and futures. As of March 31, 2021, BlockFi and its affiliates held approximately $14.7 billion in BIA investor assets and had approximately 572,160 BIA investors, including 391,105 investors in the United States.

3.      BlockFi was collectively valued at over $5 billion at the highest of the crypto-boom and was one of the largest offerors and sellers of unregistered securities in the form of yield-bearing accounts to residents of the United States and other countries around the world.[1]

4.      Despite Prince and Marquez' express and implied representations that BIAs were comparable to federally insured bank products, the BIAs are not savings, brokerage or deposit accounts protected by Securities Investor Protection Corporation (the "SIPC") or insured by the Federal Deposit Insurance Corporation  (the "FDIC"). The BIAs are subject to additional risk, compared to assets held at SIPC member broker-dealers, or assets held at banks and savings associations, almost all of which carry insurance. Nor were the BIAs registered with the SEC, or any other securities regulatory authority, nor were they exempted from registration. Marquez and Prince however created the misleading impression that BIAs were in compliance with all applicable regulations.

5.      Based on the facts and circumstances set forth herein, the BIAs were securities because they were notes under *Reves v. Ernst & Young*, 494 U.S. 56, 64–66 (1990) and its

---

[1] *See* https://financefeeds.com/private-fund-slashes-valuation-of-blockfi-e-warrants-to-0/

progeny, and also because BlockFi offered and sold the BIAs as investment contracts, under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) and its progeny, including the cases discussed by the SEC in its Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934. BlockFi promised BIA investors a variable interest rate, determined solely by BlockFi on a periodic basis, in exchange for crypto assets loaned by the investors, who were told in public statements that they could demand their loaned assets at any time, even though the fine print in documents appear to give BlockFi the right to deny withdrawals or sales of the BIAs. BlockFi thus borrowed the crypto assets in exchange for a promise to repay with interest. Investors in the BIAs had a reasonable expectation of obtaining a future profit from BlockFi's efforts in managing the BIAs based on BlockFi's statements about how it would generate the yield to pay BIA investors interest. Investors also had a reasonable expectation that BlockFi would use the invested crypto assets in BlockFi's lending and principal investing activity, and that investors would share profits in the form of interest payments resulting from BlockFi's efforts. BlockFi offered and sold the BIAs to the general public to obtain crypto assets for the general use of its business, namely, to run its lending and investment activities to pay interest to BIA investors, and promoted the BIAs as an investment. The BFI Defendants caused BlockFi to offer and sell securities without a registration statement filed, or in effect, with the Commission or any states, and without qualifying for an exemption from registration. As a result, the offer and sales of BIAs was in violation of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") and state regulations.

6.     BlockFi's unregistered offers and sales of securities, led the New Jersey Bureau of Securities, on or around July 20, 2021, to issue a cease and desist order to BlockFi, Inc., Blockfi Lending, LLC, and BlockFi Trading, LLC (referred to collectively herein as "BlockFi")

requiring that BlockFi "halt[] the offer and sale of these unregistered securities." The cease and desist order did not preclude BlockFi "from paying interest on the existing BIAs or refunding principal to the BIA Investors." Later, over 30 states followed in imposing cease and desist and/or sanctions and fines on BlockFi.

7. On or around February 14, 2022, the SEC "charged BlockFi Lending LLC (BlockFi) with, inter alia, failing to register the offers and sales of its retail crypto lending product." Further, "[t]o settle the SEC's charges, BlockFi agreed to pay a $50 million penalty, cease its unregistered offers and sales of the lending product, BlockFi Interest Accounts (BIAs), and attempt to bring its business within the provisions of the Investment Company Act within 60 days. BlockFi's parent company also announced that it intended to register under the Securities Act of 1933 for the offer and sale of a new lending product. In parallel actions then announced, BlockFi agreed to pay an additional $50 million in fines to 32 states to settle similar charges." In connection with that announcement, BlockFi's CEO publicly promised that the BIAs would be registered with the SEC.

8. In these regulatory proceedings, BlockFi admitted that its accounts were "unregistered securities."

9. The unregistered status of the BIAs deprived investors account holders of the type of information about BlockFi that would be required in SEC mandated disclosures, including information about the true risk of loss of investor assets, liquidity, holdings concentration of risk, concentration of borrowers, status of loans to borrowers and BlockFi ability to pay interest and to return funds to investors pursuant to investors demands for withdrawals. Accordingly, Plaintiff and the class were deceived into investing in BIAs.

10.     On March 1, 2021, counsel for Plaintiff herein and the class members as the Court-appointed lead counsel, brought a class action complaint styled *Mangano, individually and on behalf of all others similarly situated v. BlockFi, et al.*, Case No. 2:22-cv-01112 (the "*Mangano Action*"), alleging that the BlockFi Platform owned and operated by BLOCKFI, INC., BLOCKFI TRADING, LLC, BLOCKFI LENDING, LLC was an unregulated and unsustainable investment scheme and BlockFi was selling unregistered securities. It was specifically alleged in detail in that complaint how BlockFi was illegally selling securities and inducing innocent and unaware investors to invest in the BlockFi Platform.  The *Mangano Action* was later consolidated and a first amended class action complaint was filed on July 28, 2022. That action was stayed when BlockFi filed Chapter 11 in November 2022.

11.     The truth about Prince and Marquez' misrepresentations about BlockFi was revealed beginning on November 11, 2022, when California's financial regulator revoked BlockFi's lending license for failure to comply with California loan underwriting standards concerning the creditworthiness of borrowers and their ability to repay loans. Thereafter, additional disclosures established the extent and materiality of Prince and Marquez' misrepresentations during the Class Period.

12.     On November 10, 2022, BlockFi announced it would halt customer withdrawals and freeze account access. Thereafter Plaintiff and class members have had no access to their investments. BlockFi made this redemption freeze announcement even more permanent and terrifying for customers when it filed for bankruptcy 18 days later on November 28, 2022, leaving customers and 100,000 creditors in the lurch, with liabilities and assets ranging from $1 billion to $10 billion. Defendants herein are not subject to the automatic stay.

13.     Bankruptcy filings later revealed, *inter alia*, that one of causes of BlockFi's failure and the loss of investors' fund was that FTX affiliated Alameda had defaulted on $680 million worth of loans to BlockFi. In its bankruptcy filing, BlockFi admitted that its lockdown of investor accounts and bankruptcy was due to its undisclosed exposure to FTX, a major cryptocurrency lender that filed a bankruptcy petition on November 16, 2021.[2]

## II.     PARTIES

14.     Plaintiff Trey Greene ("Greene") is a citizen of the State of Georgia. Greene opened a BIA account from Defendants in the State of Georgia. Greene invested in unregistered securities from BlockFi in the form of the BIA account. Mr. Greene opened an account with BlockFi in early 2020 and invested various amounts in Block Fi  account holdings as set forth in Rider A. Greene never withdrew any amounts of his assets/ investments form Blocjk Fi. Green's account claims in the bankruptcy court Chapter 11 proceeding for Block Fi values green's accounts at a tiny fraction of their worth and of his deposits, interest and gains

15.     Zac Prince is the CEO and co-founder of BlockFi and has been the CEO since its inception in October 2017.[3] He was at all relevant time a director of BlockFi.

16.     Flori Marquez is the COO and co-founder of BlockFi and has been the COO since its inception in October 2017. She was as all relevant times a director of BlockFi.

17.     During the Class Period, BlockFi Inc.'s Board of Directors consisted of *inter* alia, Defendants Prince, Marquez, Tony Laura (BlockFi's CFO) and Jennifer Hill (the "BFI Defendants"). As Officers Directors and co-founders of BlockFi, and persons with discretionary

---

[2] *See* https://www.reuters.com/technology/crypto-lender-blockfi-says-it-has-significant-exposure-ftx-2022-11-14/ (last visited November 16, 2022).

[3] *See* Robert Stevens, BlockFi's Rise and Fall: A Timeline, Coin Desk (https://www.coindesk.com/learn/blockfis-rise-and-fall-a-timeline/ last visited December 6, 2022)

control over Plaintiffs' and other class members' assets, the BFI Defendants also owed fiduciary duties to them including the disclosure of all material information to investors.

18.     Defendant Gemini Trust Company LLC ("Gemini") is a New York based trust company which holds BlockFi's clients' (Plaintiff and class members) cryptocurrency holdings as a "Qualified Custodian" chartered by the New York State Department of Financial Services under Section 100 of the New York Banking law and is subject to NYDFS capital reserve requirements. During the Class Period, both Gemini and BlockFi described themselves as "partners." Tyler Winklevoss, Gemini's CEO is also an owner of BlockFi through its participation in BlockFi's August 2019 Series A funding.  BlockFi "supported" the Gemini Dollar ("GUSD") on BlockFi's platform for BIA accounts and BlockFi has described Gemini as its "institutional partner," since mid-2019 in written statements.

19.     Defendants Marquez and Prince described how Plaintiffs' investments held at Gemini supposedly in "custody of Gemini" were used, contrary to Gemini representations. Marquez and Price said: "We lend out assets deposited into our account at Gemini to highly vetted institutional counterparties;" "Our risk and finance teams review all of our counterparties financials before they become a qualified borrower;"

### III.     JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over claims under the Securities Act pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331, and supplemental jurisdiction over the entire action under 28 U.S.C. § 1367.

21.     Venue is proper under 28 U.S.C. § 1391 because Defendants have their principal place of business in this District and therefore reside in this District. Venue is further proper pursuant to 15 U.S.C. § 78aa.

22.     This Court has personal jurisdiction over Defendants because they are subject to general jurisdiction in this District because Defendants' principal place of business is in this District.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

23.     BlockFi was founded in 2017 by Prince and Marquez and launched a public beta version in January 2018. Its business initially consisted of the issuance of loans backed by customers' bitcoin and ether. BlockFi is a financial services company that engages in cryptocurrency and other digital asset trading, lending and borrowing. It uses investors' monies to invest in crypto currencies. BlockFi Trading LLC, BlockFi's wholly owned subsidiary, also controlled by Defendants Prince and Marquez, is a money transmitter which accepts investors monies and digital assets from Plaintiff and class members and transfers said funds to BlockFi for investment in BlockFi Interest Accounts ("BIAs"). BlockFi is the issuer of the BIAs.

24.     BlockFi touted itself as a "Chase Bank powered by crypto", lending "to partners like Susquehanna or Fidelity", "serving its clients and ensuring their funds are safeguarded", and a place where "client funds are safe + accessible."

25.     On or about April 27, 2020, during a podcast called "Going Deep with Aaron Watson," Marquez stated:

> Yeah. So at a high level, you can kind of think of us as a Chase Bank powered by crypto
>
> We're one of the leading providers of assets for banks that want to borrow crypto to fuel those trading strategies.  So we'll lend it out to partners like Susquehanna or Fidelity is big and crypto they'll pay us a yield to borrow that Bitcoin. And then we'll flow that yield through to our clients.
>
> No one in crypto had said let's build a regulated financial services platform. So we were one of the first companies to go out there and start interacting with

8

regulators and try to get licenses so that we could build this the right traditional way.

As a company, we really believe in being simple, transparent, and trustworthy in terms of simplicity.

*See* https://www.goingdeepwithaaron.com/podcast/flori-marquez

26.     Joshua Farfield a professor at Washington and Lee Law School noted: "These companies are all giving the impression of bank like security"; "These companies want to have customer trust with none of the responsibility that comes with a regulated financial industry. And that just doesn't work." https://www.nytimes.com/2022/12/05/business/cryptocurrency-investors-ftx-blockfi.html. "Ordinary Investors Who Jumped Into Crypto Are Saying Now What?" last accessed February 7, 2023.

27.     BlockFi allowed investors to invest in BIAs by depositing certain eligible cryptocurrencies or cash into accounts at BlockFi. BlockFi then pooled the cryptocurrencies assets of the BIAs together to fund its lending operations and proprietary trading. In exchange for investing in the BIAs, investors are promised a rate of return paid monthly in cryptocurrency. The BIAs were obviously "securities" given their features, terms and conditions and functions. BFI Defendants would not, however, register the BIAs as "securities."

28.     In March 2019, BlockFi expanded its product line to include business accounts. In December 2019, BlockFi launched a crypto-trading product.  Soon thereafter, BlockFi established a trading desk, a crypto trust and began developing its own branded credit cards.

    **B.**     **BlockFi's Investment Products**

29.     BlockFi has offered the following investment products to Plaintiffs and the Class:

- "Wallet" accounts – non-interest bearing accounts ("BlockFi Wallet") to store digital assets supported by BlockFi;"

- "Trading" accounts – enables clients to buy, sell and exchange digital assets supported by BlockFi"

- "Retail Client Loans" accounts – enables clients to borrow USD or stable coins [including GUSD] from BlockFi secured by digital asset collateral;"

- "Interest Account" – interest bearing accounts that allow clients to earn interest on BlockFi supported digital assets they transfer to their accounts;"

- "Institutional Client Loans" – "miners, exchanges and trading firms" are allowed to borrow cash or crypto. The source of cash and cryptos available for borrowing are from Plaintiffs and class members' BIA assets.

30.     BFI Defendants knew BlockFi's retail investors were <u>not</u> sophisticated or experienced investors and thus knew that Prince and Marquez' statements and descriptions of BlockFi's structure and products and risks had the capacity to mislead and did mislead investors in BIAs. This is admitted in the Renzi the Declaration of Michael Renzi ("Renzi Decl.") submitted with BlockFi's First Day Motion in the United States Bankruptcy Court for New Jersey, wherein he states: "Understanding the difficulty many individuals face in entering the investment world, BlockFi created web and mobile applications that enabled its retail clients to easily access, trade, borrow and store select digital assets." Renzi at 10, ¶ 31.

31.     All investors in BIA had to "sign up on the BlockFi platform; . . . open an account provided by Debtor BlockFi Trading LLC . . . operated and maintained by BlockFi Wallet LLC" Renzi Decl. p. 10, ¶ 32. "BlockFi clients can also earn money through a BlockFi Interest Account ("BIA") . . . that allow clients to earn interest on supported digital assets. Renzi Decl. p. 13 at 37. "The BIA agreement is with . . . . BlockFi, Inc." Renzi Decl. p. 13 at 39. In addition, for class members who are "BlockFi Private Clients," BlockFi borrows digital assets from clients

and these loan agreements are between the BlockFi investor and BlockFi Lending LLC, Renzi p. 14, ¶ 42. Class members can also borrow U.S. dollars or stable coins from BlockFi using their digital assets as collateral, those class members also have agreements with BlockFi Lending LLC.

32. The BlockFi BIA Terms provide that a BlockFi BIA Investor relinquishes control over the deposited cryptocurrency to BlockFi and BlockFi is free to use those assets as it sees fit, including commingling cryptocurrency with those of other BIA Investors, investing those assets in the market, and lending those assets to institutional and corporate borrowers. Without any control over the investments once deposited, the BIA Investors are passive investors.

33. According to the terms of the investment accounts, in purchasing an unregistered BIA, investors:

> [G]rant BlockFi the right, without further notice to [the investor], to hold the cryptocurrency held in [the] account in BlockFi's name or in another name, and to pledge, repledge, hypothecate, rehypothecate, sell, lend, or otherwise transfer, invest or use any amount of such cryptocurrency, separately or together with other property, with all attendant rights of ownership, and for any period of time and without retaining in BlockFi's possession and/or control a like amount of cryptocurrency, and to use or invest such cryptocurrency at its own risk.

34. Plaintiff and class members can also buy, sell and exchange digital assets through their BlockFi accounts, in such case, Plaintiff and class members have separate "retail trading agreements" with BlockFi trading. Renzi Decl. p. 16 at ¶ 48.

35. The BFI Defendants intentionally set up the foregoing series of entities through which Plaintiffs' and class member assets would pass to avoid having to comply with securities regulations.

C.     **Prince And Marquez Make Misleading Statements**
       <u>**About How The BlockFi Investment Products Work**</u>

36.     Prince and Marquez misleadingly stated that Plaintiffs' and class members"

"cryptocurrency in your BlockFi Wallet shall at all times remain with you and shall not transfer

to BlockFi."

37.     During the Class Period, in addition to misrepresenting that BlockFi was similar

to a bank, Prince and Marquez misrepresented the safety of investor assets and BlockFi's risk

management practices. Prince and Marquez had BlockFi misleadingly emphasize the safety of

investors' funds in its "Wallet Accounts." Defendants Prince and Marquez marketed BlockFi as

an investment where investors' assets were "not hypothecated" and "not commingled… with

assets in other BlockFi programs" and that "title…remains with you…" and that "BlockFi shall

not sell, transfer, loan hypothecate or otherwise alienate cryptocurrency held in your BlockFi

wallet…." However, as Prince and Marquez knew and intended, since the overwhelming

majority of BlockFi investors opened BlockFi accounts and made investments specifically to

earn the interest dangled by BlockFi on BIA it was incumbent upon Marquez and Prince to fully

disclose how the BIA investment operated and was constructed and that once Wallet Assets were

used to earn interest for the investor those assets became invested in BIAs.  Prince and Marquez

misleadingly obscured and/or concealed the fact that once an investor sought to earn interest on

their BlockFi investment, the investors' BlockFi investment immediately became eligible to be

rehypothecated, sold, lent, and transferred by BlockFi from their accounts to be used for

BlockFi's profit and/or benefit.

### D.      Gemini

38.      Both Gemini and other Defendants here made representations about the investors ease of access to the assets in their accounts because of the role of Gemini as "custodian" of Plaintiff and class members' investments.

39.      BlockFi and Gemini shared common ownership, Gemini was BlockFi's custodian, BlockFi supported the Gemini Dollar ("GDSO") on its platform for BIA customers and BlockFi has described Gemini as its "institutional partner," since mid-2019.

40.      BlockFi custodied investors' assets at Gemini during the Class Period.

41.      As custodian for Plaintiff's and other class members' BlockFi account assets, Gemini owed duties to inform Plaintiff and class members of material facts concerning their accounts and assets.

42.      Gemini publicly described itself as a "global digital asset platform." Consistent with the press release publicized by BlockFi that Gemini and Blockfi were "institutional partners," Gemini Managing Director, Sarah Olsen, said in a BlockFi release dated May 29, 2019, (after BlockFi announced its support for the Gemini Dollar (GUSD) stable coin throughout BlockFi's platform); "…we're excited to support market leaders like BlockFi in their efforts."

43.      Gemini knew of, and acquiesced in, the materially false and misleading statements about the status the safety and accessibility of Plaintiff's and class members' assets at Gemini and about the risks of loss. Gemini supplied materially false and misleading information to BlockFi for use in marketing the BIAs.

44.      As custodian for Plaintiff and other class members bitcoin assets, Gemini had a duty to inform Plaintiff and class members and/or make public the fact that Gemini effected loans to institutional crypto counterparties with Plaintiff and class members custodial funds.

45.     Gemini also made materially false and misleading statements about the status of Plaintiff and class members custodial funds.

46.     Gemini represented in its Custody Agreement (https://www.gemini.com/legal/custody-agreement#section-questions lost accessed12/20/223:55 PM): "We will not loan, hypothecate, pledge, or otherwise encumber any assets in your Custody Account absent General Instructions from you."

47.     Gemini also represented:

> By entering into this Custody Agreement, you agree that you intend to create a bailment of Asset with us, and you agree that you intend that we be the bank.

*Id*.

48.     Gemini and BlockFi's representations were revealed to be materially false and misleading when it was disclosed in December 2022 that Gemini halted BlockFi client withdrawals because of liquidity problems at Genesis Global Capital.

### E.     Prince And Marquez' False Statements About BlockFi's Financial Condition; Risks Of Investing In Its Products; Its Business Model And Risk Management Practices

49.     Defendants Prince and Marquez made material misstatements to Plaintiff and the class in the offer and sale of BIAs through advertising and general solicitations on BlockFi's website, social media accounts, YouTube, Twitter and Facebook nd its "Partner Program" and other offers and promotions.

50.     Throughout the Class Period, Defendants Marquez and Prince made materially false and misleading statements regarding: (i) liquidity and accessibility of the BIA assets to investors; (ii) the legal status of ownership of crypto assets held on behalf of its customers, which assets BlockFi knew or recklessly disregarded could qualify as the property of a

bankruptcy estate, making those assets potentially subject to bankruptcy proceedings in which BlockFi's customers would be treated as the Company's general unsecured creditors; (iii) the nature of the BIAs and whether the BIAs would be required to be registered as securities with the SEC and applicable state regulations; (iv) the risks of a "run" on BlockFi if the crypto market generally, or BlockFi's borrowers specifically, were to experience liquidity, regulatory or credit problems; (v) the risk of, and loss of access, to their BIA account assets due to regulatory and governmental action against BlockFi; (vi) the extent quality and effectiveness of BlockFi's loan underwritings; internal controls; the credit risk of BlockFi borrowers; and the extent of and quality of the "collateral" BlockFi purported to require of its borrowers; (vii) the conflicts of interest between BlockFi, the BlockFi Defendants and Plaintiff and class members; (viii) the sustainability of BlockFi's business model to the extent it was based on the "Grayscale Trade."

51.   **FLORI MARQUEZ**

- **Marquez:** Yeah. So at a high level, you can kind of think of us as a Chase Bank powered by crypto.
- **Marquez:** we're one of the leading providers of assets for banks that want to borrow crypto to fuel those trading strategies.  So we'll lend it out to partners like Susquehanna or Fidelity is big and crypto they'll pay us a yield to borrow that Bitcoin. And then we'll flow that yield through to our clients.
- **Marquez:** No one in crypto had said let's build a regulated financial services platform. So we were one of the first companies to go out there and start interacting with regulators and try to get licenses so that we could build this the right traditional way.
- **Marquez:** As a company, we really believe in being simple, transparent, and trustworthy in terms of simplicity.
- **Marquez:** what we do as a business is we take those assets and we lend it to institutional investors like Akuna Capital, Fidelity, and Susquehanna, many of whom are also investors in BlockFi, and they pay us a yield to borrow those assets and we flow that yield through to our retail investors.
- **Marquez:** As leaders and builders, it's our responsibility to be transparent about the lessons we've learned and how we can best move forward.
- **Marquez:** [C]lient funds are safe + accessible and that BlockFi will continue to grow and build! No client funds are being utilized to pay for the settlement.

52.     In 2020, BlockFi representatives were telling customers, *inter alia*:

(a)  Our counter party credit risk audit is extremely extensive.

(05/29/20)

BlockFi is the only institutionally backed crypto wealth
management platform.

We run or company the right way.

(b)  "We lend out assets deposited into our account at Gemini to highly vetted

institutional counterparties."

(c)  "Our risk and finance teams review all of our counterparties financials before

they become a qualified borrower."

(d)  "Our lending arrangements are typically over collateralized and allow us to

margin call those counterparties on a daily basis."

53.     Within the first few weeks of launching the BIA, BlockFi touted investors'
potential for profit.  On March 20, 2019, BlockFi announced that BIAs experienced significant
growth, including from large firms who participated in BIAs "as a way to bolster their returns."
BlockFi asserted that it "provide[d] the average crypto investor with the tools to build their
wealth," and that it "look[ed] forward to giving even more investors a chance to earn a yield on
their crypto."

54.     The BFI website advertises the BIAs as part of a long-term investment strategy
for investors, claiming that a BIA "provides clients with the ability to earn more crypto while
holding for long-term investments.  Interest is paid monthly and compounds.  This significantly
increases the potential earnings of long-term account holders."

55.     The BFI Website includes a chart stating "BlockFi's Interest Account works hardest for you as a long-term investment," which claims to illustrate the projected effect of holding a BIA as a long-term investment:



56.     BlockFi pools these cryptocurrencies together, where according to BlockFi, it (1) reserves a portion of the cryptocurrencies to meet investor withdrawal demands, (2) lends some or all of the balance to third parties, or (3) purchases equities, options, and futures for its own

account. BlockFi uses the revenue from those activities to pay the BIA Investors the agreed-upon interest rate, and keeps the remainder for itself as profit.

57.     Despite the true nature of BlockFi's potential for insolvency, "[t]he BFI Website claims that 'BFI is a US regulated entity, and that [BlockFi] play[s] by the rules, to the benefit of [BlockFi] and [its] clients.'"

58.     Instead, Marquez and Prince doubled down with more false promises about "products that are reliable, accessible and trusted," "[C]lient funds are safe + accessible," and "funds are safeguarded."

[1] *See* https://www.cnbc.com/video/2021/03/15/this-crypto-lending-company-offers-credit-services-for-cryptocurrency.html

59.     BlockFi regularly touted the profits investors may earn by investing in a BIA. When announcing the BIA, BlockFi promoted the interest earned, promising "an industry-leading 6.2% [annual percentage yield]," compounded monthly.  BlockFi described it as "an easy way for crypto investors to earn bitcoin as they HODL."[4]

60.     The BFI Website advertises that the BIA "provides market-leading yields to crypto investors" and currently advertises an annual return of up to 7.5% on certain digital assets deposited in a BIA:

---

[4] "HODL" is a purposeful trendy misspelling of "hold" an acronym for "hold on for dear life", denoting buy-and-hold strategies in the context of crypto assets.

 

61.     The BFI Website contains a page with a detailed presentation of the
cryptocurrencies it accepts for investment into the BIAs and the corresponding interest rates
offered for each type of cryptocurrency deposit:

# Interest Rates

Check here to find the latest rates for interest-earning accounts and loans. Please note that interest rates, withdrawal limits, and fees are subject to change

## BlockFi Interest Account (BIA)

Annual Percentage Yield (APY)* BlockFi Interest Account clients can deposit their crypto and earn interest. Paid out at the beginning of every month, the interest earned by account holders compounds, increasing the annual yield for our clients. BlockFi uses a tiered interest structure. Click here to learn how our tiers work.

| Currency | Amount ** | APY |
|----------|-----------|-----|
| BTC (Tier 1) | 0 - 0.25 BTC | 4% |
| BTC (Tier 2) | 0.25 - 5 BTC | 1.5% |
| BTC (Tier 3) | > 5 BTC | 0.25% |
| ETH (Tier 1) | 0 - 5 ETH | 4% |
| ETH (Tier 2) | 5 - 50 ETH | 1.5% |
| ETH (Tier 3) | > 50 ETH | 0.25% |
| LTC (Tier 1) | 0 - 100 LTC | 4.5% |
| LTC (Tier 2) | > 100 LTC | 2% |
| LINK (Tier 1) | 0 - 750 LINK | 3% |
| LINK (Tier 2) | > 750 LINK | 0.5% |
| USDC (Tier 1) | 0 - 50,000 USDC | 7.5% |
| USDC (Tier 2) | > 50,000 USDC | 5% |

| GUSD (Tier 1) | 0 - 50,000 GUSD | 7.5% |
| GUSD (Tier 2) | > 50,000 GUSD | 5% |
| PAX (Tier 1) | 0 - 50,000 PAX | 7.5% |
| PAX (Tier 2) | > 50,000 PAX | 5% |
| PAXG (Tier 1) | 0 - 5 PAXG | 2% |
| PAXG (Tier 2) | > 5 PAXG | 0.5% |
| USDT (Tier 1) | 0 - 50,000 USDT | 7.5% |
| USDT (Tier 2) | > 50,000 USDT | 5% |
| BUSD (Tier 1) | 0 - 50,000 BUSD | 7.5% |
| BUSD (Tier 2) | > 50,000 BUSD | 5% |
| DAI (Tier 1) | 0 - 50,000 DAI | 8.5%**** |
| DAI (Tier 2) | > 50,000 DAI | 6%**** |
| UNI (Tier 1) | 0 - 750 | 3.75%**** |
| UNI (Tier 2) | > 750 | 1.5%**** |
| BAT (Tier 1) | 0 - 25,000 | 3.65%**** |
| BAT (Tier 2) | > 25,000 | 1.4%**** |

* APYs reflect effective yield based on monthly compounding. Actual yield will vary based on account activity and compliance with BlockFi's terms and conditions. Rates are largely dictated by market conditions, which are a key factor in a company's ability to provide its clients yield on their crypto assets. For more information, please see our Terms of Service. Rates are subject to change. BlockFi will communicate any rate changes prior to these changes taking effect. Digital currency is not legal tender, is not backed by the government, and the BlockFi Interest Account (BIA) is not a bank account nor a brokerage account, and is not subject to FDIC or SIPC protections.

**Although there is no minimum balance required to earn interest, accounts are still subject to Gemini's withdrawal minimums. 0.003 BTC and 0.056 ETH. Withdrawals for balances smaller than these amounts may take up to 30 days to process.

***BlockFi Interest Accounts are available in most countries worldwide and all U.S. states other than NY

****Terms Apply

62.     BlockFi issued quarterly "Transparency Reports" during the Class Period which

contained numerous materially false and misleading statements as follows:

**BlockFi Wallet**

We provide all of our clients a non-interest bearing account to
store supported digital assets (the "Wallet"). Digital assets
transferred to a Wallet account are not deployed by us for our
revenue generating activities and are instead held in either wallets
we control, or with our custodial partners.

BlockFi's core value is Transparency Builds Trust—which is
paramount to maintaining and expanding our clients' trust. As
such, we view risk management as key to our success. We seek to

monitor and control our risk exposure through an enterprise risk management framework, including by managing liquidity and credit risks that could potentially impact our obligations to clients that have a BIA, or with whom we have a BPC or other type of individually-negotiated borrowing arrangement.

We have established the following guidelines to manage our liquidity risks and available balances of short- term assets:

- We will hold at least 10% of total amounts due to clients upon demand in inventory, ready to be returned to clients.

- We aim to hold at least 50% of total amounts due to clients upon demand either in inventory or in loans that can be called within seven calendar days.

- We aim to hold at least 90% of total amounts due to clients upon demand either in inventory or in loans that can be called back within one year.

As of June 30, 2022, the fair value of our outstanding loans to borrowers was approximately $1.8 billion. We require many, but not all, borrowers to post varying levels of collateral depending on the borrower's credit profile and the size of the loan portfolio. As of June 30, 2022, our net exposure was approximately $0.6 billion. We define net exposure as the sum of our net exposures to individual loan counterparties. Our net exposure to each individual loan counterparty equals the fair value of loans to the counterparty minus the fair value of collateral provided by the counterparty (excluding any amount of the counterparty's collateral that is in excess of the counterparty's loans). The average term of all loans within our loan portfolio is less than one year.

As of June 30, 2022, the fair value of our outstanding loans to institutional borrowers was approximately $1.5 billion. Each institutional client that borrows from us undergoes a credit due diligence process to allow our credit risk underwriting team to establish appropriate credit limits. We have established an internal credit lending policy that generally limits exposure to any one borrower, principal or guarantor based on net exposures, which represents our aggregate exposure to economically related borrowers for approval purposes. Based on our internal credit process, our loan approvals follow a transaction authority and

credit limit matrix, which are based on a counterparty's financial information and size, business model related to traditional or digital assets markets, country of domicile, leverage, and other credit measures.

63.     In other materials made publicly available, BlockFi reported:

**Overview of Risk Management at BlockFi**

The Risk team uses a comprehensive risk management framework across four key risk areas:

1.     Credit Risk

2.     Liquidity Risk

3.     Market Risk

4.     Enterprise Risk

Credit Risk Management involves a thorough analysis of our counterparties to understand their financial standing and ongoing ability to repay loans. A critical aspect of credit risk is managing concentration to help ensure we don't take on too much risk to any one single borrower.

As part of the credit analysis process, all institutional counterparties undergo a full due diligence and underwriting analysis which includes a review of their operation and financial statements, with focus on leverage and liquidity. Each client is assigned an internal credit rating (e.g., Tier 1, 2, or 3) along with a specific credit limit corresponding to the rating achieved. The credit evaluation is part of a detailed onboarding process, which also considers the business model, KYC/AML, organizational structure, industry dynamics, client reputation, track record, quality and frequency of financial disclosures, and their general transparency. For counterparties engaged in trading activities, we review the risk framework and associated controls. In conjunction with establishing credit appetite, we typically negotiate a master loan agreement which may include a number of borrower covenants, and includes our contractual lender rights.

At BlockFi, unsecured lending appetite is limited to our largest and most established Tier 1 clients based on the potential of attractive risk-adjusted returns. Only those clients that have a significant capital base, verifiable financial position, and a willingness to be

> transparent and engaged with us may be afforded an unsecured credit limit.
>
> Our Credit Risk Management team regularly reviews the credit framework, client transactions, and changing market conditions.
>
> As discussed above, we require our Tier 2 and Tier 3 institutional client borrowers, and many of our Tier 1 institutional client borrowers, to post collateral against their loans.
>
> To help ensure we have sufficient risk capital to withstand stressed market conditions and potential counterparty defaults in the loan portfolio, we've designed a custom risk capital model for our digital asset portfolio. The BlockFi model is based on the Basel III Economic Capital Framework, which applies to most major banking institutions worldwide.

64.     Prince and Marquez misled investors by claiming that BlockFi was a "market intermediary" which exempted it from the '40 Act registration requests. However, that representation was false because unlike true "market intermediaries" BlockFi did not make transactions on both sides of the market for "financial contracts."

65.     Prince and Marquez represented that BlockFi loans were "typically" over collateralized when in fact almost 80% of BlockFi's large institutional loans which presented liquidity and concentration of risk damages to BlockFi were not over collateralized. SEC Order 23-23, 25. The aforesaid misrepresentations deprived investors of "complete and accurate information with which to evaluate the risk "to class members investments if BlockFi institutional borrowers defaulted. Order 23, 35.

66.     BlockFi never disclosed any information about the concentration of its crypto counterparties. Neither Plaintiff nor class members had any way to know that BlockFi was working with undercapitalized borrowers such as Celsius, Three Arrow Capital, FTX and Alameda.

**F.** **Undisclosed Conflicts Threatened The BIA Investments**

67.    BlockFi various functions and services, as well as its diverse array of client's in the bitcoin – lending ecosystem together with BlockFi's obligation to its shareholders to maximize profits led to multiple conflicts with Plaintiff and the Class which were undisclosed.

68.    The BFI Defendants concealed the conflicts of interest between BlockFi and its BIA investors. These conflicts existed because of the way BlockFi had positioned itself in the crypto currency ecosystem and because of BlockFi's equity investments in Graystone and the fact that BlockFi was lending investor assets to entities such as FTX, Three Arrows Capital, Akuna Capital, Fidelity, Alameda Research, Susquehanna and Gemini. BlockFi and those entities had multilevel relationships with each other as lenders, borrowers, equity owners and co-investors in Grayscale which conflicted with the interest of Plaintiff and the class. Block Fi's relationships with other cryptocurrency exchanges, issuers, lenders and borrowers exposed plaintiff and other class members to the systemic risk in the cryptocurrency eco-system which was never disclosed to plaintiff and other class members.    The conflicts of interest / systemic riosk manifested themselves in that BlockFi's business model depended on the continual sale of BIAs which BlockFi could use to continue lending at a profit over the interest paid on BIAs and the ability of other cryptocurrency eco-system players to continue to participate . But this conflicted with the Plaintiff's and class members' interests to have their investment funds be kept safe and accessible.

69.    BlockFi was heavily invested in Grayscale Securities and its closed end trust Grayscale Bitcoin Trust ("GBTC").

70.    As a closed end trust, GBTC was a registered security whose "shares" were at Net Asset Value ("NAV") to investors, including BlockFi.

71.     GBTC cannot be redeemed, it can only be sold in the open market where its price can fluctuate from a premium to NAV to par NAV to a discount to NAV.

72.     Any investors in GBTC including BlockFi, were subject to a six month or more lock up period before the GBTC shares purchased could be sold in the open market.

73.     BlockFi and other institutional investors understood the arbitrage opportunities inherent in buying GBTC at NAV and selling at a premium to NAV. It that became known as the "Grayscale Trade."

74.     By 2020-2021, the Grayscale Trade premium was about 20% providing enormous arbitrage profits to investors, two of the biggest being Three Arrows Capital and BlockFi according to published reports. The extent to which BlockFi's business model depended on the existence of a premium to GBTC over NAV in the marketplace was never disclosed to Plaintiff or class members.

75.     As of the end of 2021, BlockFi and Three Arrows Capital were the two largest holders of GBTC shares collectively owning 58,741,046 shares of GBTC.

76.     This meant that the security of BlockFi's loans to Three Arrows depended on the premium to GBTC's NAV and the value of GBTC depended on BlockFi not selling GBTC in any size to avoid depressing the market and compressing the premium of GBTC's to its NAV or depressing its NAV.

77.     Thus, even though it conflicted with the interests of investors in BlockFi such as Plaintiff and the class, BlockFi was locked into holding and not selling its GBTC even after it came off the mandatory lock up.

78.     On or about early February 2021, while GBTC still traded at a premium to NAV, BlockFi purchases an additional 11.9 million shares of GBTC boosting its stake to 36.1 million

shares. Many of those shares were restricted for six months for shares purchased with BTC and ETH and one year for LTC purchased shares.

79.     On February 24, 2021, the GBTC premium vanished and GBTC began to trade at a discount to NAV. This completely undermined BlockFi's business model Grayscale Fund.

80.     By late 2021, two bitcoin ETFs (GBTC was denied ETF status by the SEC) appeared on the market attracting capital and investors away from GBTC. The depressed market value of GBTC and widened the discount, materially undermining BlockFi's liquidity.

81.     The fact that the Greyscale Trade was a major pillar of BlockFi's business model was demonstrated by its prominent role in 2021 in a fundraising deck of slides. *See* Swan Bitcoin, December 14, 2022 "GBTC was the Genesis of the Crypto Credit Contagion" by Sam Callahan.

### G.     BFI Defendants Concealed The Low Level Of Collateralization Of Loans Made To Institutions With Investors Assets

82.     Prince and Marquez knew that their pitch to investors that BlockFi was like a bank ("Chase") meant that Plaintiff and the class would consider material information to be the level of collateralization of the loans to institutions that BlockFi was making using Plaintiff's and class members' investment monies in the BIAs.

83.     That knowledge and understanding by Marquez and Prince led them to conceal from investors between March 4, 2019 to August 31, 2021 that its institutional loans were not "typically" over collateralized as it stated on multiple websites. In fact in 2019, only 24% of institution loans were over collateralized which fell to 16% in 2020 and 17% in 2021.

84.     These early misrepresentations about the level or risk in BlockFi's loan portfolio and about BlockFi's risk management practices generally misled investors, including Plaintiff and the class.

85.     After it stopped misrepresenting <u>levels</u> of collateralization however, the BFI

Defendants continued to misrepresent the quality of collateral.

86.     Although BlockFi reported that the $1 billion loan to Three Arrows Capital was

over-collateralized by 30%, it appeared later that two thirds of that collateral (approximately $1

billion) was bitcoin of indeterminate origin. The other third of the collateral was shares of

Grayscale Bitcoin Trust ("GBTC") itself a crypto investment product. When BlockFi attempted

to liquidate its GBTC collateral, the price plunged. Despite the so-called "over-collateralization"

of the Three Arrows loans, BlockFi CEO announced that BlockFi lost $80,000,000 when it

liquidated the Three Arrows' collateral.

87.     Prince and Marquez's statements about collateralization were also materially false

and misleading for implying that risks of investing in BlockFi were minimal because of its

reported "over-collateralization" without disclosing that BlockFi was exposed to additional

material though its broad range of yield generating activities in addition to borrowing and

lending crypto assets and rehypothecation activity.

88.     These statements were false, misleading, and designed to induce customers to

maintain their BIAs believing customer "funds are safeguarded" on the BlockFi platform.

89.     In reality, Prince and Marquez had exempted its offshore borrowers, like Three

Arrows Capital, whose digital assets were not registered with any U.S. jurisdiction or regulatory

authority and unconstrained by U.S. securities law, from risk mitigation measures and provided

them with significant special treatment, including a virtually unlimited "line of credit" and non-

recourse loans to experiment with highly volatile and speculative cryptocurrencies funded by the

platform's customers.  As a result of this exposure to Three Arrows, BlockFi took a roughly $80

million loss from defaulted loan obligations.

90.    Defendants also exempted another offshore borrower,  hedge fund Alameda Research, a hedge fund inextricably linked to FTX and Sam Bankman Fried, whose digital assets were not registered with any U.S. jurisdiction or regulatory authority and unconstrained by U.S. securities law, from risk mitigation measures and provided them with significant special treatment, including recklessly entrusting hedge fund Alameda Research with  $680,000,000 in undercollateralized loans without undertaking even the most basic and fundamental due diligence, credit check, and gave no regard for Alameda Research's ability to repay debt, except for receiving "unaudited quarterly financial statements and crypto wallet addresses" and "regular dialogue with Alameda staff, who 'made ongoing representations regarding its financial standing, significant equity capital, and unencumbered assets on Alameda's balance sheet."[5]

91.    Plaintiff and the Class were misled because they did not have complete accurate and truthful information about the risk of BlockFi's loan portfolio and the risk that in the event of default or decline in values of cryptocurrency value BlockFi would be unable to comply with its obligations to pay BIA investors the return of assets and accrued interest.

**H.    BFI Defendants Knew That Regulatory Actions Commencing In July 2021 Made BIAs An Unsafe Investment But Failed To Disclose The Then Present Level Of Risk**

92.    Prince and Marquez failed to disclose that beginning in January 7, 2021, BlockFi was contacted by a "Multistate Working Group") ("MWG") a working group of members of the North American Securities Administrators Association ("NASAA") consisting of state regulators, which notified BlockFi, Prince and Marquez that the MWG believed that BlockFi was selling and offering securities which did not comply with state securities laws.

---

[5] *See* https://www.axios.com/2022/11/28/blockfi-alameda-680m-default

93.     BlockFi continued to offer and sell the BIAs without registering them as securities or seeking an exemption from registration.

94.     On July 19, 2021 New Jersey filed a summary cease and desist order alleging that BlockFi was offering and selling unregistered securities in the form of BIAs.

95.     Alabama, Texas, Vermont, Kentucky and Washington followed with their own regulatory proceedings on July 22, 29 and September 23 respectively.

96.     The Arizona Corporation Commission, penalizing BlockFi $943,396, also found that a statement on BlockFi's website also materially overstated the degree to which BlockFi's collateral practices protected its ability to pay investors:

> The Commission found BlockFi failed to comply with Arizona's securities registration requirements and, as a result, investors were sold unregistered securities in violation of state law and deprived of critical information and disclosure necessary to understand the potential risks regarding the BIAs. The Commission found that a statement on BlockFi's website also materially overstated the degree to which BlockFi's collateral practices protected its ability to pay investors.

*See* https://azcc.gov/securities/news/2022/06/30/corporation-commission-joins-with-other-state-securities-regulators-and-the-s.e.c.-to-settle-with-a-digital-asset-lending-platform-for-unlawful-securities-sales.

97.     An Iowa consent order– a document signed by BlockFi's General Counsel – made a similar finding:

> (BlockFi Interest Accounts) investors did not have complete and accurate information with which to evaluate the risk that … BlockFi would be unable to comply with its obligation to pay.

98.     The SEC's Order Instituting Cease-And-Desist Proceedings states that because of BlockFi's "omission about the level of risk in its loan portfolio, BIA investors did not have complete and accurate information with which to evaluate the risk that, in the event of defaults by its institutional borrowers, BlockFi would be unable to comply with its obligation to pay BIA investors the stated interest rates or return the loaned crypto assets to investors upon demand."

99.     Despite these fines, warnings and guidance from regulators to update their

warnings, disclosures, and collateralization practices, Prince and Marquez refused to heed them.

100.     On or about March 15, 2021, during a CNBC interview, Marquez was asked:

Q: you say that you pay 8.6% on crypto assets in these accounts, how are you generating that income, it's not off the crypto is it?

A (Marquez): this is actually one of my favorite products.  People can send us cash and it gets turned into stablecoin or you can send us crypto and what we do as a business is we take those assets and we lend it to institutional investors like Akuna Capital, Fidelity, and Susquehanna, many of whom are also investors in BlockFi, and they pay us a yield to borrow those assets and we flow that yield through to our retail investors.

101.     The SEC has concluded that the BIAs were NOT individually tailored to

customers (class members) demands or requests or inquiries. SEC Order at 29, 38-39.

102.     On or about February 6, 2022, Prince personally and publicly assured investors

that:

[C]lient funds are safe + accessible and that BlockFi will continue to grow and build! No client funds are being utilized to pay for the settlement.



I.      **The Materially False And Misleading Nature Of The Representations**

103.    Defendants implied through their representations that investors could redeem, withdraw, or close BIA accounts in full on demand.

104.    Defendants improperly pledged loaned class members' securities to fund speculative and risky loans to companies with liquidity problems like a $680,000,000 loan Alameda Research and a $1 billion loan to venture firm Three Arrows Capital, which were not properly disclosed to BlockFi customers.

105.    Indeed, until the truth was revealed and BlockFi was compelled to disclose how it lost hundreds of millions of customer and investor money, neither BlockFi nor its officers or directors ever even hinted, let alone affirmed, that it was engaged in risky, directional, proprietary bets and loans that exposed the Company to tremendous loss by overconcentrating hundreds of millions of dollars to companies or Ponzi schemes with liquidity problems likes Three Arrows Capital and Alameda Research.

106.    BlockFi did not warn or provide notice to class members that (a) it was at a heightened bankruptcy risk; (b) was lending customer money to offshore companies with liquidity problems and illiquid volatile collateral like Alameda Research and Three Arrows; (c) was lending customer money to companies without doing the requisite due diligence, underwriting or credit assessment; (d) was lending customer money to companies which had conflicts of interest with BlockFi and/or in which Prince and Marquez had a direct conflict of interest; (e) that BlockFi may need to register its BIAs. Nor did BlockFi warn customers that by selling/offering the BIAs it may be violating securities laws, subject to enforcement actions, cease-and-desist orders, penalties, and lawsuits from every state in the country.

107.   Throughout the class period, Defendants regularly provided false and misleading information regarding the security and safety of customer money and/or failed to disclose the highly speculative and risky offshore loans and investments being made with customer money and the true risk and likelihood that BlockFi would declare bankruptcy, freeze customer accounts, and customers would lose all the money in their BlockFi accounts.

108.   BlockFi never disclosed any information about the concentration of its crypto counterparties. Plaintiffs nor class members had any way to know that BlockFi was working with undercapitalized borrowers such as Alameda Research, Three Arrows Capital and others.

109.   BlockFi's opaqueness could have been mitigated and investors spared from decimating losses. Throughout 2020 and 2021 and 2022, BlockFi reused to offer "Proof of Reserves" to its clients (*i.e.* class members) despite the industry trend in that direction stated to industry players such as Lend; Gate.io; Coin shares; Bit MEX; Nexo and Kraken. Proof of Reserves allows clients to individually verify that the client's assets were accounted for.

110.   Defendants also failed to disclose the intertwined nature of the crypto lending business with risky and thinly capitalized third parties through rehypothecation – using borrowers' collateral to borrow more money/crypto from other lenders. BlockFi CEO Zac Prince admitted in July 2022 that BlockFi was negatively impacted by the troubles at Celsius and Three Arrows Capital.

111.   Had investors and class members known or even been warned about their exposure to unregistered securities, potential Ponzi schemes, unstable offshore hedge funds backed by esoteric cryptocurrency, borrowers with no collateral, non-recourse loans, SEC fines, state fines, lawsuits, judgments, consent orders, increased bankruptcy risk, account redemption freezes, and asset loss, they would not have invested with BlockFi.

112.    Leaving account holders in the dark of these known and substantial risks, BlockFi capitalized on account holder ignorance of these substantial and debilitating risks to profit from paying artificially low interest payments to class members and eventually siphoning their accounts to pay for salaries, bonuses, and risk filled investments and loans.

### J.    After BlockFi Revealed A Loss From Its Loans To Three Arrows, Prince And Marquez Continues To Mislead Investors

113.    Following the Three Arrows loss, Defendant Prince lied to BlockFi customers about its exposure to Three Arrows:

> We exercised our best business judgment recently with a large client that failed to meet its obligations on an overcollateralized margin loan," CEO Zac Prince tweeted. "We fully accelerated the loan and fully liquidated or hedged all the associated collateral.

*See* https://www.coindesk.com/business/2022/06/16/blockfi-liquidated-three-arrows-capital-report/

114.    **ZAC PRINCE**

- **Prince:**  Today's landmark announcement reinforces BlockFi's commitment to serving its clients and ensuring their funds are safeguarded. (Twitter June 21, 2022)
- **Prince:**  As a matter of principle, we fundamentally believe in protecting client funds. Not only because it's absolutely the right thing to do, but this also benefits the ongoing health and adoption of crypto financial services worldwide. (Twitter July 1, 2022)
- **Prince:**  Therefore, it was important to add capital to our balance sheet to bolster liquidity and protect client funds. (Twitter July 1, 2022)
- **Prince:**  This represents the full extent of the impact to BlockFi from 3AC. We have no further exposure and the limited losses we did experience will be absorbed by BlockFi with no impact to client funds. (Twitter July 1, 2022)
- **Prince:** For our clients, absolutely nothing changes in terms of how you experience BlockFi products - but there is now even more upside in the future. (Twitter July 1, 2022)
- **Prince:**  It's time to stop putting @BlockFi in the same bucket / sentence as Voyager and Celesius.  Two months ago we looked the "same".  They shut down and have impending losses. (Twitter July 11, 2022)
- **Prince:**  Putting @BlockFi alongside Celsius and Lehman Brothers in the same sentence is misleading. (Twitter July 12, 2022).

- **Prince:** I'm really impressed with what Sam and the FTX team has done throughout this time in terms of supporting the industry (MSNBC interview July 13, 2022)
- **Prince:** So it's night and day like you can't compare Goldman to Lehman Brothers in terms of how they've continued to operate. And so I think there's an analogy like that. (MSNBC interview July 13, 2022)
- **Prince:** our team didn't miss a beat as we successfully navigated through the turbulence;
- **Prince:** While this is a valid question to ask, there are more important ones to answer - like how does the industry move forward, and will we survive? The short answer is YES, we will survive.

115.    On July 21, 2022, BlockFi made public its Q2 2022 Transparency Report:

Platform Assets and Management of Liquidity and Credit Risks. This report also fraudulently

induced customers into believing their funds are safeguarded in claiming:

> We have established the following guidelines to manage our liquidity risks and available balances of short-term assets:
>
> - We will hold at least 10% of total amounts due to clients upon demand in inventory, ready to be returned to clients.
> - We aim to hold at least 50% of total amounts due to clients upon demand either in inventor or in loans that can be called within seven calendar days.
> - We aim to hold at least 90% of total amounts due to clients upon demand either in inventory or in loans that can be called back within one year.

116.    On or about June 21, 2022, Prince personally and publicly assured investors that:

> Today's landmark announcement reinforces BlockFi's commitment to serving its clients and ensuring their funds are safeguarded.



117.   On July 11, 2022, Prince personally and publicly assured investors that:

PSA to journalists + market commentators
It's time to stop putting @BlockFi in the same bucket / sentence as
Voyager and Celsius.  Two months ago we looked the "same".  They
shut down and have impending losses.



118.   Also on July 11, 2022, Prince personally and publicly assured investors that:

> Hey Meltem :) Just fyi - BlockFi directly holds zero GBTC. The
> Bloomberg data on this is outdated. We have a couple small loans
> (like sub $10M) w/ GBTC as collateral that are in the process of
> winding down



119.    On or about July 12, 2022, in responding to a Twitter thread from Dan Morehead,

CEO of Pantera Capital, Prince personally and publicly assured investors that:

> [Y]our report has some glaring inaccuracies re @BlockFi that I would be remiss
> not to call out…
> Putting @BlockFi alongside Celsius and Lehman Brothers in the same sentence is
> misleading. They were / are bankrupt or insolvent - we are not. I would appreciate
> you editing this if you're open to being more accurate with your writing.
> I think it's important for thought leaders like you to recognize nuance and not make
> inaccurate, negative statements about others in the industry. Hope you will consider
> this feedback pragmatically.



120.     On or about July 13, 2022, Prince gave an interview on MSNBC. Prince started

the interview by claiming:

I just want to start by expressing my sincere condolences to anyone who's been negatively impacted by the platform shutdowns and bankruptcies that we've seen across the space over the last couple months. So the FTX transaction for Block five, we're really excited about it. There's two key parts of this transaction. The first is a 400 million dollar credit facility.

Which importantly, is subordinate to our client funds. The second is an option to acquire BlockFi for up to $240,000,000, which can be exercised at the earliest in the fall of 2023. Now the goal of this deal, from BlockFi's perspective, was to bolster our balance sheet so that we can navigate these market conditions.

From a position of strength. And over the longer term, we see really interesting synergies between the two firms. And I'm really impressed with what Sam and the FTX team has done throughout this time in terms of supporting the industry.

121.    On or about September 6, 2022, Prince personally and publicly assured investors

that:

There are certainly lessons learned, but our team didn't miss a beat as we successfully navigated through the turbulence. Our team is prepared to do whatever we can to ensure that our industry emerges stronger and more transparent.



122.    Also on or about September 6, 2022, Prince personally and publicly assured

investors that:

> Recently I've been asked a lot about how navigated and withstood the hyper volatile
> market back in June. While this is a valid question to ask, there are more important
> ones to answer - like how does the industry move forward, and will we survive?
> The short answer is YES, we will survive. The longer answer relates to HOW do
> we survive and thrive? Crypto has undergone a rapidly condensed version of the
> 2008 financial crisis, and we need to start looking back on lessons learned so we
> can move forward.



123.    On or about September 6, 2022, Marquez personally and public stated:

> As leaders and builders, it's our responsibility to be transparent
> about the lessons we've learned and how we can best move forward.



124.     On or about November 6, 2022, Marquez personally and publicly assured

investors that:

> At the end of the day, our priority is to ensure that all people who want to earn
> interest on their digital assets can do so through a trusted provider like BlockFi.
> While we're limited in what we can say, we can confirm we're having productive
> conversations with regulators as we move through this nuanced process…Zac
> Prince and I are so incredibly proud of the team at @ BlockFi for continuing to
> listen to and learn from our clients so that we can provide digital asset products that
> are reliable, accessible and trusted.



125.    Also on or about November 6, 2022, Marquez personally and publicly assured

investors that:

> Our team is hard at work building products that make managing
> your #crypto wealth easier. Check out all that we accomplished in October.



126.    On December 21, 2022, Caroline Ellison, who was the chief executive of the cryptocurrency hedge fund Alameda Research guilty to federal criminal fraud charges and are cooperating in the prosecution of the disgraced crypto entrepreneur, Sam Bankman Fried.[6]

127.    Before filing for Chapter 11 bankruptcy, it was a necessary element, to continue to persuade, influence and convince the common investor, as cash was getting scarce, to continue

---

[6] See https://www.nytimes.com/2022/12/21/technology/ftx-fraud-guilty-pleas.html

to put their earned money (sometimes life savings) into specifically the BlockFi Platform. To do this, Prince and Marquez, co-founders and officers of BlockFi, made a plethora of false and misleading public statements that were broadcast around the country through the internet.

128.    As defendants well knew, they were required to invest it customers' funds exclusively in safe, highly liquid securities or in other conservative low risk loans and only after vetting and performing due diligence on target borrowers to ensure customer money would always be available to withdraw in full on short notice.

129.    Based on materials on BlockFi's website, financial statements, and publicly available materials, defendants knew, or should have known that BlockFi's guiding investment objective for customer portfolios was supposed to be preservation of capital and liquidity in even the most turbulent of market conditions.

### K.    BFI Defendants' Other Wrongful Conduct

130.    Defendants had a duty to properly keep investor or class member funds in a segregated accounts and have adequate capitalization so that investors could redeem, withdraw, or close accounts in full on demand and failed to do so.

131.    As a result, it would be impossible for all investors or class members to redeem or withdraw their funds in full or close their accounts at once on any given time.

132.    Defendants improperly pledged loaned class members' securities to fund speculative and risky loans to companies with liquidity problems like a $680,000,000 loan Alameda Research and a $1 billion loan to venture firm Three Arrows Capital, which was not properly disclosed to BlockFi customers.

133.    Indeed, until the truth was revealed and BlockFi was compelled to disclose how it lost hundreds of millions of customer and investor money, neither BlockFi nor its officers or

directors ever even hinted, let alone affirmed, it's business and customers assets were fully dependent on companies with liquidity problems likes Three Arrows and Alameda Research.

134.    BlockFi did not warn or provide notice to class members that it was at a heightened bankruptcy risk, was lending customer money to offshore companies with liquidity problems and no collateral like Alameda Research and Three Arrows, was lending customer money to companies without doing the requisite diligence, was lending customer money to companies with which Prince and Marquez had a direct conflict of interest, or that BlockFi may need to register its offers and sales of BIAs. Nor did BlockFi warn customers that it may be violating securities laws, subject to enforcement actions, cease-and desist orders, penalties, and lawsuits from every state in the country.

135.    Defendants failed to disclose that in the event of BlockFi's insolvency and bankruptcy, Plaintiff and class members assets could be available to all creditors to share. Defendants also failed to warn investors that if too many class members sought return of their investment, BlockFi would have to file for bankruptcy.

136.    Had investors and class members known or even been warned about their exposure to unregistered securities, potential Ponzi schemes, unstable offshore hedge funds backed by esoteric cryptocurrency, borrowers with no collateral, non-recourse loans, SEC fines, state fines, lawsuits, judgments, consent orders, increased bankruptcy risk, account redemption freezes, and asset loss, they would not have invested with BlockFi.

137.    Leaving account holders in the dark of these known and substantial risks, BlockFi capitalized on account holder ignorance of these substantial and debilitating risks to profit from paying artificially low interest payments to class members and eventually siphoning their accounts to pay for salaries, bonuses, and risk filled investments and loans.

L.     **BlockFi's Risky Investments With Plaintiff
And Class Members' Assets Caused BlockFi's Demise**

1.     **Three Arrows Capital**

138.    Three Arrow Capital was a Singapore based crypto hedge fund.

139.    Defendants concealed its exposure to Three Arrow Capital to continue to induce investors to buy BlockFi securities. Defendants had an incentive to conceal the risk presented by BlockFi's exposure to Three Arrow Capital because Three Arrow Capital since at least early 2020 has been a "strategic investor" to BlockFi.

140.    Three Arrow Capital became BlockFi's first or second largest borrower client.

141.    Three Arrow Capital commingled accounts of its owners and lenders.

142.    Three Arrow Capital asset base was disproportionately invested in Grayscale Bitcoin Trust ("GBTC").

143.    BlockFi was a significant owner of GBTC increasing its position from $250 million in 2020 to $1.7 billion by February 2021. BlockFi's own GBTC position was at risk because of Three Arrow Capital's own GBTC position.

144.    Three Arrow Capital's GBTC position was subject to serial six month lock-ups thus exposing Three Arrow Capital to price declines with no exit. But by Spring 2021, Three Arrow Capital's GBTC stake had fallen below the value of the coins in the trust.

145.    It has been publicly reported that Three Arrow Capital creditors were reluctant to reveal the true extent of their losses at Three Arrow Capital for fear of inviting increased scrutiny from investors and regulators.

146.    Three Arrow Capital was reluctant to post collateral for borrowed capital and instead offered lenders higher interest rates: 10% or more.

147.     In August 2021, two of Three Arrow Capital's operations manager (and minority partners) left and Three Arrow Capital did not/could not replace their expertise or pickup their workload.

148.     By mid-2021, Three Arrow Capital refused to post bitcoins as collateral but instead pledged its illiquid investment in "Deorbit," a private company. There were also suspicions in the market that Three Arrow Capital had pledged its GBTC stake more than once.

### 2.     Alameda And FTX

149.     BlockFi's lending relationship with Alameda started in 2019 and BlockFi started trading on the FTX platform in 2021.

150.     BlockFi also held $355 million of crypto on FTX.

151.     FTX allowed Alameda to use FTX customer funds to buy FTT tokens to prop up the value of FTT tokens.

152.     Alameda was propped up by an ability to borrow funds from FTX.com for Alameda's trading and investments "without any effective limits" according to FTX new CEO John J. Ray in a declaration filed in the FTX bankruptcy.

153.     BFI Defendants could not have performed any real due diligence on Alameda or else they would have discovered that a major portion of Alameda's assets consisted of loan receivables consisting of promissory notes from Sam Birchman-Friedman for loans to himself from Alameda.

154.     Upon recovery of FTX/Alameda records, John J. Ray III in his declaration in support of the FTX/Alameda chapter 11 petition (In re FTX Trading Ltd D. Del BK 22-11068) described FTX/Alameda financial information as follows:

"Never in my career have I seen such a complete failure of

corporate controls… compromised systems and… concentration of

control in the hands of a very small group of inexperienced,

unsophisticated and potentially compromised individuals."

155.     BFI Defendants knew that the FTT token which was the collateral supporting the

BlockFi loans to Alameda were illiquid because defendants had access to trading volume and

trading prices for FTT. Thus, defendants could see that the value that Alameda assigned to FTT

tokens was a modest value that was not reliable given the illiquidity in trading of FTT and the

fact that FTX and Alameda owed the majority of FTT tokens.

156.     BFI Defendants had notice of FTX and Alameda's fraudulent activities and

structure via the very detailed factual allegations in the action entitled *Bitcoin Manipulation

Abetment LLC v. FTX Trading LTD and Alameda Research et al*, USDC N.D. CA 19-CV-07245

filed on November 2, 2019. That complaint laid out in factual detail commingling,

misappropriation, manipulation of FTX client funds, and lack of controls on procedures to ensure

accurate financial reporting.

157.     Alameda also had loans and payments to insiders in excess of at least $1.38

billion including loans where FTX's CEO signed a loan as both borrower from Alameda and as

CEO of Alameda.

158.     Alameda had no plausible or reliable internal controls. A large percentage of

Alameda's balance sheet assets were in the form of FTT tokens.

159.     FTX had no board of directors or even an accounting department in house.

Neither FTX nor Alameda even performed daily reconciliation of positions on the blockchain.

160.     Alameda did not have complete books or records for its investments or activities.

49

161.    BFI Defendants, but not investors, could have easily discovered Alameda's fraudulent operations because they could learn, or already knew, that FTX customers were directed to wire money to Alameda's account in exchange for bitcoin assets on FTX.

162.    BFI Defendants knew or could have and should have known of the risks presented by Alameda because Alameda balance sheets which were circulating in 2022 showed it.

163.    BFI Defendants misled clients in July in describing the $400 million line of credit from FTX by failing to disclose that the line of credit allowed BlockFi to only draw on FTX's FTT token.

164.    The BlockFi bankruptcy revealed that:

> (i)      Alameda was the recipient of $680 million of loans from BlockFi;
>
> (ii)     Some of the collateral for BlockFi loans was FTX's Robinhood common stock;
>
> (iii)    BlockFi held $350 million of FTX crypto currency token: FTT.

165.    It was later revealed that most of Alameda Research assets of reportedly $14.6 billion was mostly the FTT token issued by FTX.

166.    Despite the extensive marketing materials, website, prime time news interviews, social media posts, and other sales gimmicks designed to entice consumers into the BlockFi BIAs, BFI Defendants never once, until it was too late, disclose that it was giving loans to Three Arrows Capital and/or PTX and/or Alameda.

167.    BlockFi's opaqueness could have been mitigated by the BFI Defendants and investors spared from decimating losses. Throughout 2020 and 2021 and 2022, BlockFi reused to offer "Proof of Reserves" to its clients (*i.e.* class members) despite the industry trend in that direction stated to industry players such as Ledn; Gate.io; Coinshares; Bit MEX; Nexo and

Kraken. Proof of Reserves allows clients to individually verify that the client's assets were accounted for.

168.    BFI Defendants also failed to disclose the intertwined nature of the crypto lending business with risky and thinly capitalized third parties through rehypothecation – using borrowers' collateral to borrow more money/crypto from other lenders. BlockFi CEO Zak Prince admitted in July 2022 that BlockFi was negatively impacted by the troubles at Celsius and Three Arrows Capital.

169.    BlockFi's undisclosed rehypothecated financial position profoundly threatened its solvency.

170.    BlockFi admitted in 2022 that there had been "increased withdrawal demand." Eventually BlockFi was forced to admit it needed hundreds of millions of dollars of additional liquidity from outside sources.

171.    While it was looking for emergency financing, BlockFi was offered only financing packages which would subordinate client assets to the new lenders.

172.    In late June 2022, Crypto Exchange FTX provided a $250 million emergency line of credit to BlockFi.  Reportedly, equity investors in BlockFi were "wiped out" and had written off losses.

173.    On April 13, 2022, BlockFi, Incl. assumed the obligations of BlockFi Lending LLC, a wholly owned subsidiary of BlockFi, Inc. under interest bearing accounts and converted the "BlockFi Interest Accounts" to "BlockFi Lending Accounts."

174.    In May 2022, BlockFi reduced the interest rates paid to clients by approximately 50%.

175.    Effective July 1, 2022, BlockFi eliminated the free withdrawal once per month for certain types of digital assets and now charged up to $25 per withdrawal. This change hit class members hard inasmuch as in 2022 over 75% of BlockFi crypto withdrawals were without fees.

176.    Defendants could have known, and likely did know, of the problems with its loans to other crypto entities through monitoring of "on-chain data" which is used by crypto platforms to trace crypto traders and lenders' transactions.

**M.    BlockFi Bankruptcy**

177.    On November 28, 2022, after the bailout from FTX proved to be a house of cards, BlockFi filed for Chapter 11 bankruptcy, Case No.  3:22-bk-19361.

178.    On November 29, 2022, the Bankruptcy Court granted a motion to extend the time by which the Debtors shall file their Schedules and Statements to January 11, 2023, an additional 30 days beyond the 14-day extension provided for pursuant to Bankruptcy Rule 1007(c).

179.    Also on November 29, 2022, BlockFi counsel told a U.S. bankruptcy judge that the U.S. lawyers representing crypto lending firm BlockFi called the company "the antithesis of FTX."

180.    "This is the antithesis of FTX," Joshua Sussberg, a Kirkland & Ellis lawyer representing BlockFi, said in his opening statement.[7]

181.    In a presentation to the Bankruptcy Court, BlockFi's bankruptcy counsel essentially admitted that all along Defendants Prince and Marquez had been creating the misleading impression that BlockFi was a financial institution by stating: "This has been a

---

[7] See https://news.yahoo.com/blockfi-bankruptcy-hearing-antithesis-ftx-200256698.html

company that was focused on creating an opportunity for people that otherwise don't have access to the financial system."[8] Sussberg added.[9]

182.    Sussberg did not elaborate that the "financial system" to which BlockFi was so desperate to provide access for ordinary people was no more than duping customers into believing their money was safe to earn higher than average interest while BlockFi was taking that money and gambling it on FTX, Alameda Research and Three Arrows Capital, which has been dubbed an offshore [ ] and "Madoff-style Ponzi Scheme",[10] respectively, essentially robbing them of hundreds of millions of dollars leaving thousands of ordinary retail investors "destitute.

183.    Sussberg's argument mirrored the efforts made by BlockFi's bankruptcy declaration on Monday to distance itself from Sam Bankman-Fried's disgraced empire, which filed for Chapter 11 bankruptcy earlier this month.

184.    Seemingly Sussberg made these statements to give the impression that BlockFi would not receive the same "ponzi scheme" label and distance BlockFi from claims that it might be liable for the "misuse of its customers' funds" as FTX was.[11]

185.    In its petition, BlockFi revealed it had more than 100,000 creditors with estimated assets and liabilities of between $1 billion and $10 billion.

_____

[8] *Id.*

[9] *Id.*

[10] *See* https://www.coindesk.com/business/2022/06/28/research-firm-fsinsight-accuses-three-arrows-capital-of-running-a-madoff-style-ponzi-scheme/

[11] See https://www.thestreet.com/memestocks/crypto/ftxs-sam-bankman-fried-greatest-ponzi-scheme

186.     In its bankruptcy filings, BlockFi's financial advisor, Berkley Research Group, through Mark Renzi, said that BlockFi's "exposure to [FTX and Alameda Research] created a liquidity crises at BlockFi which led to its bankruptcy filing.

187.     In bankruptcy BlockFi admitted for the first time that Three Arrows Corporation was "one of BlockFi's largest borrower clients" whose collapse "led to material losses for BlockFi."

## V.     CLASS ALLEGATIONS

188.     Plaintiff brings this action individually and on behalf of the following Class of persons: All persons or entities in the United States who invested in a BIA account from March 4, 2019 to November 10, 2022 (the "Class Period"). Excluded from the Class are: affiliates of, corporate officers, members of the boards of directors, and senior executives of BlockFi Defendants; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which Defendants have or had a controlling interest.

189.     **Numerosity.** The members of the Class and Subclasses are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable. Upon information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of members in the Class and Subclasses. Although the precise number of Class members is unknown to Plaintiff, the true number of Class members is known by Defendants and may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendants.

190.     **Existence and predominance of common questions of law and fact.** Common questions of law and fact exist as to all members of the Class and Subclasses and predominate

over any questions affecting only individual Class members. These common legal and factual

questions include, but are not limited to, the following:

(a)     whether the BIAs were unregistered securities under federal and

California law;

(b)     Whether Defendants' offerings and sales of BIAs violates the registration

provisions of the Securities Act and the California Corporations Code;

(c)     whether Defendants are liable to Plaintiff, the Class, and Subclasses for

unjust enrichment; and

(d)     The type and measure of damages suffered by Plaintiff and the Class.

191.     **Typicality.** Plaintiff's claims are typical of the claims of the other members of the

Class in that, among other things, all Class and Subclasses members were similarly situated and

were comparably injured through Defendants' wrongful conduct as set forth herein. Further,

there are no defenses available to Defendants that are unique to Plaintiff.

192.     **Adequacy of Representation.** Plaintiff will fairly and adequately protect the

interests of the Class and Subclasses. Plaintiff has retained counsel that is highly experienced in

complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action

on behalf of the Class and Subclasses. Furthermore, Plaintiff has no interests that are antagonistic

to those of the Class or Subclasses.

193.     **Superiority.** A class action is superior to all other available means for the fair and

efficient adjudication of this controversy. The damages or other financial detriment suffered by

individual Class and Subclass members are relatively small compared to the burden and expense

of individual litigation of their claims against Defendant. It would, thus, be virtually impossible

for the Class or Subclass on an individual basis, to obtain effective redress for the wrongs

committed against them. Furthermore, even if Class or Subclass members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

194.    In the alternative, the Class and Subclasses may also be certified because:

(a)     the prosecution of separate actions by individual Class and Subclass members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the Defendant;

(b)     the prosecution of separate actions by individual Class and Subclass members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)     Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## VI.   CAUSES OF ACTION

### COUNT I

**Unregistered Offer and Sale of Securities in Violation of Section 5 of the Securities Act
Section 12(1) And Section 15(a) for Controlling Person Liability
(Against BFI Defendants)**

195.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

196.   Prince and Marquez made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

197.   The BIAs are securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1) (defining "security" to include a "note" and an "investment contract").

198.   Plaintiff and members of the Class purchased BIAs securities through the BlockFi website and/or smartphone application.

15 U.S.C. §§ 77e(a) states:

> Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—
>
> > (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or
> >
> > (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

199.    As discussed above, there was no registration statement in effect related to the BIAs.

200.    By offering and/or selling unregistered BIAs to Plaintiff and Class members, BFI Defendants violated Sections 5, 12 and 15 and are liable to Plaintiff and the members of the Class.

201.    The BFI Defendants by and through their stock ownership of BlockFi and executive and director positions controlled BlockFi and exercised such control to cause it to engage in the illegal practices described herein and are therefore liable as controlling persons of BlockFi.

202.    As a direct and proximate result of BFI Defendants' unregistered offering and sale of BIA securities, Plaintiff and members of the Class suffered damages.

## COUNT II

**Violations of Section 12(a)(2) and Section 15 of the Securities Act
(Against BFI Defendants)
For Offering Solicitation And Sale Of Unregistered Securities Through Materially False
Solicitations And Controlling Person Liability**

203.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

204.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class against the BFI Defendants.  This Count is not alleging fraud or intentional conduct or recklessness.

205.    BFI Defendants are "sellers" for purposes 12(a)(2) of the Securities Act pursuant to 17 C.F.R. §230.159A.

206.    BFI Defendants had direct and active participation in the solicitation of Plaintiff's and Class members' purchases and communicated directly with Plaintiff and the Class through

the solicitation materials for their own financial interest and are also a "statutory sellers" under Section 12(a)(2).

207.    Plaintiff and the other members of the Class acquired BIAs solicited and sold pursuant to written materials which were materially false and misleading.

208.    As alleged above, the written materials contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein as more fully set forth in Count III, infra.

209.    BFI Defendants owed to acquirers of BlockFi securities, including Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in solicitation and sales materials and related documents to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact.

210.    Plaintiff and the other members of the Class acquired BIAS securities solicited by and pursuant to the materials described herein and neither Plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in those offering documents.

211.    By virtue of these violations, Plaintiff and the other members of the Class have sustained damages.

212.    Less than one year has elapsed from the time that Plaintiff discovered the facts upon which this complaint is based to the time that Plaintiff filed the Complaint.  Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff filed this Complaint.

213.     By and through their stock ownership of BlockFi and positions as officers and/or directors, the BFI Defendants had the power and exercised same to cause BlockFi to engage in the illegal acts described herein and are therefore liable as controlling persons.

## COUNT III

**Violation Of Section 10(b) and 20(a) Of The Exchange Act
And Rule 10b-5 Promulgated Thereunder Against All Defendants**

214.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

215.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase BIAs at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants took the actions set forth herein.

216.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the BIAs an effort to maintain artificially high market prices for BIAs in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

217.     Defendants, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the BIAs.  These defendants employed devices, schemes and artifices to defraud while in possession of material

adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of BIAs securities during the Class Period.

**Defendants' Scienter**

218.     Defendants could have and should have known, and likely did know, of the problems with its loans to other crypto entities through monitoring of "on-chain data" which is used by crypto platforms to trace crypto traders and lenders' transactions.

219.     As early as 2020, Alameda was already notorious for its "complete lack of a risk management framework" as it was described by Austin Campbell, the former co-head of digital assets trading at Citigroup, to the Wall Street Journal as publicly reported on January 2, 2023.

220.     Similarly, digital investment firm Arca, wrote in a blog post on the Arca website in October 2022, that FTX's role as the largest market maker of FTT constituted a "Large conflict of interest" with "larger" "embedded risk."

221.     In the Declaration of Mark A. Renzi in Support of Debtors' Chapter 11 Petitions and First Day Motions filed November 28, 2022, Renzi stated there were no "failure of corporate controls or systems integrity" *Id*. at pg. 5, ¶ 11. Accordingly, that sworn statement compels the inference that BlockFi's controls and systems allowed the BFI Defendants to know and understand the risks presented by BlockFi's exposure to, transactions with, BAC, FTX and Alameda. Prince and Marquez scienter is obvious.

222.    The BFI Defendants knew and understood that Alameda's assets used as collateral for BlockFi's loans to Alameda were FTT tokens because, as explained by Renzi in his Declaration: ". . . an individual may look up the ID of that [crypto currency] token to identify the wallet from where the token was sent and the wallet it was sent to." Renzi Decl. pg. 6, ¶ 15.

223.    BFI Defendants had ample scienter-motive to mislead and deceive investors because the influx of class member assets is what drove the value of BlockFi, Inc.'s Preferred Stock and equity and allowed BFI Defendants to cash out of their non-publicly traded equity. From 2019 to 2021, BlockFi Inc. completed five preferred stock financing transactions at ever increasing prices from 1.054 per share to 1.5722 per share to 1.747 per share for the three series of A preferred. The B preferred was priced at 3.79 per share in February 2020; the C preferred was priced at 9.51 per share in September 2020, the D preferred was sold for $58.737 per share in May 2021, and the E preferred was sold for $75.7442 per share in August 2021.

224.    The proceeds of later series of preferred stock were used in part to repurchase previously issued Preferred Stock and common stock for cash. Renzi Decl. p. 24 at ¶ 76.

225.    Defendants participated in this conduct in order to realize unjust returns in the form of income, salary, stock, equity, commissions, compensation, and profits at the risk of bankruptcy and losing customer investment.

226.    For instance, on August 14, 2019, BlockFi filed a Form D Notice of Exempt Offering of Securities.  The Form D provided a total equity offering of 20,470,859 with "$1,000,000 of the gross proceeds will be used to repurchase Common Stock from certain executive officers of the company in a secondary sale transaction."[12]

---

[12] *See* https://www.sec.gov/Archives/edgar/data/1726072/000172607220000001/xslFormDX01/primary_doc.xml

227.    On February 14, 2020, BlockFi filed a Form D Notice of Exempt Offering of Securities.  The Form D provided a total equity offering of $37,542,812 with "[a]pproximately $6,940,000.00 of the gross proceeds will be used to repurchase capital stock from certain executive officers of the company and funds affiliated with certain directors of the company in a secondary sale transaction."[13]

228.    The BFI Defendants' primary and controlling person liability arises from the following facts: (i) the Defendants through any by stock ownership, were privy to and participated in the creation, development and sales of BIAs and (iii) each of these defendants knew, was aware of, or recklessly disregarded the BlockFi's dissemination of information to the class that was misleading false or misleading.

229.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in failing to ascertain and disclose such facts, even though these facts were readily available to them.  Defendants' material misrepresentations and/or omission were done knowingly or recklessly.  Defendants' materially false and misleading statements and omissions clearly demonstrate that, if they did not have actual knowledge of the misrepresentations and omission alleged, they were reckless in failing to obtain such knowledge and deliberately refrained from taking the steps necessary to determine whether those statements were false or misleading.

230.    The BFI Defendants ("Controlling Defendants") acted as controlling persons of BlockFi within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions and due to their participation in and/or control of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained

---

[13] *See* https://www.sec.gov/Archives/edgar/data/1726072/000172607220000001/xslFormDX01/primary_doc.xml

in the Materials filed with the SEC, had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the Materials that Plaintiff contends are materially incomplete and misleading.

231.    Had Plaintiff and the members of the Class known the truth regarding BFI and the BIAs, Plaintiff and the Class would not have purchased the BIAs.  At the very least, Plaintiff and the other members of the Class would not have purchased BIAs at the artificially inflated prices which they paid.

232.    As a result of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

233.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT IV

### Unregistered Offer and Sale of Securities in Violation of The New Jersey Uniform Securities Law, N.J.S.A. 49:3-60 (Against Defendants Prince And Marquez)

234.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

235.    Plaintiff brings this claim individually and on behalf of the members of the Class and New Jersey Subclass against Defendants.

236.    The BIAs are securities as defined in N.J.S.A. 49:3-49(m) (defining "security" to include a "note" and an "investment contract").

237.    The BIAs were and are required to be registered with the Bureau pursuant to

N.J.S.A. 49:3-60.

238.    The BIAs have not been registered with the Bureau, are not exempt from

registration, and are not federally covered.

239.    Defendants have offered and sold unregistered securities in violation of N.J.S.A.

49:3-60.

240.    By selling unregistered BIAs to Plaintiff and Class members, Defendants violated

the New Jersey Uniform Securities Law, and are liable to Plaintiff and the members of the New

Jersey Subclass.

241.    As a direct and proximate result of Defendants' unregistered sale of BIA

securities, Plaintiff and members of the Class and Subclass have suffered damages. N.J.S.A.

49:3-71.

## COUNT V

**Aiding and Abetting Breach of Fiduciary Duty Owed To The BFI Defendants By BlockFi**

242.    Plaintiffs repeat and re-allege the allegations contained in preceding paragraphs

above, as if fully set forth herein.

243.    As alleged above, the BFI Defendants breached its fiduciary duties to Plaintiff.

244.    BFI Defendants substantially assisted or encouraged the wrongdoing that

constituted the breach of fiduciary duty owed by  BlockFi by publicly supporting and endorsing

BlockFi and encouraging Plaintiffs to invest in BlockFi and its BIAs; in doing so, Defendants

made material misrepresentations and/or omitted material facts concerning BlockFi to Plaintiffs,

as described above.

245.    Defendants pushed these false representations, knowing full well they were false, and lent their credibility as experienced investors to dupe the public into investing into the deceptive BlockFi Platform, through press conference and via social media, which contained clear misstatements and omitted material facts that should have been disclosed to Plaintiff, and by other actions described in this complaint.

## COUNT VI

### Violation of Consumer Fraud Act,
### N.J.S.A. §§ 56:8–1 et seq.

246.    The allegations contained in the previous paragraphs are incorporated by reference. This Count is brought on behalf of the Class.

247.    The CFA was designed to promote the disclosure of relevant information to enable the consumer to make intelligent decisions in the selection of products and services.

248.    BFI Defendants and Plaintiff are "persons" within the meaning of the CFA. N.J.S.A. § 56:8-1(d).

249.    BFI Defendants' advertising and sale of BIA accounts constitute "advertising" and "sale" of "merchandise" and/or "services" within the meaning of the CFA. N.J.S.A. § 56:8-1(a), (c) and (e).

250.    BFI Defendants' practices described above constitute as "unconscionable commercial practice[s], deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission," and therefore, are unlawful under the CFA N.J.S.A. § 56:8-2.

251.    Plaintiff and the class members have suffered an ascertainable loss of money and property as a result of Defendants' unlawful practices as alleged herein.

252.     Pursuant to N.J.S.A. § 56:8-19, Plaintiff, on behalf of himself and the class, seeks treble damages, reasonable attorneys' fees, filing fees, reasonable costs of suit, and any other appropriate legal or equitable relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, demands judgment against the Defendants, jointly, severally or in the alternative, as follows:

a.     An order certifying this matter as a class action under Rule 23;

b.     A judgment for injunctive relief enjoining Defendants from engaging in future violations of the CFA;

c.     A judgment for actual damages under each count alleged herein;

d.     A judgment for compensatory damages under each count alleged herein;

e.     A judgment for treble damages under the Consumer Fraud Act at N.JS.A, 56:8-19;

f.     A judgment for reasonable attorney fees and costs of suit in connection with this action, pursuant to the CFA at N.J.S.A. 56:8-19;

g.     A judgment for a refund of all moneys acquired by Defendants due to unlawful acts, under the CFA at N.J.S.A. 56:8-2.11;

h.     A judgment for pre-judgment and post-judgment interest; and

i.     A judgment for such other and further relief as the Court deems equitable and just.

## <u>NOTICE TO ATTORNEY GENERAL OF ACTION</u>

A copy of this Complaint will be mailed to the Attorney General of the State of New

Jersey within ten (10) days after the filing of the Complaint with the Court, pursuant to N.J.S.A.

56:8-20.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: February 28, 2023           **SQUITIERI & FEARON, LLP**


*/s/ Lee Squitieri*
305 Broadway, 7th Floor
New York, New York 10007
(212) 421-6492
lee@sfclasslaw.com

**MOORE KUEHN, PLLC**
Fletcher Moore
Justin Kuehn
30 Wall Street, 8th Floor
New York, New York 10005
(212) 709-8245
fmoore@moorekuehn.com
jkuehn@moorekuehn.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

I, **Trey Greene** ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the Class Action Complaint and authorizes its filing on his behalf.

2.     Plaintiff did not purchase the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any action arising under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and Plaintiff is willing to serve as a lead plaintiff either individually or cooperate as part of a group of lead plaintiffs, a lead plaintiff being a representative party who acts on behalf of other class members in directing the action.

4.     Plaintiff was at all relevant times an investor in Block Fi accounts.

5.     In total, Plaintiff invested $1,586,492.00 in Block Fi via transfer of funds and re-invested over approximately $ 200,00.00  in earned credited interest on his Block Fi accounts and re-invested approximately $ 200,000.00 of capital gains on his Block Fi assets back into Block Fi  without ever effecting any withdrawals out of Block Fi. In addition , plaintiff's losses include accrued but un-credited interest at the rate of 9% per annum  on the total of the balances in his accounts with the total amount subject to discovery.  Plaintiff's assets are frozen and unavailable and their worth is indeterminate and being valued at zero for the purposes of estimating plaintiff's losses here.

6.     During the three-year period preceding the date on which this

1

Certification is signed, Plaintiff has not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      Plaintiff agrees not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      Plaintiff declares under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

2/27/2023

Executed this ___ day of February 2023          __              _____

Trey  Greene

2